647 So.2d 254 (1994)
William A. PULLUM, Appellant,
v.
Edwin Mac JOHNSON and Faith Bible College, Inc. d/b/ Faith Communication, Appellees.
No. 94-387.
District Court of Appeal of Florida, First District.
November 29, 1994.
T.A. Borowski, Jr. of Emmanuel, Sheppard & Condon, Pensacola, for appellant.
Michael Gibson of Johnson, Green & Locklin, P.A., Milton, for appellees.
VAN NORTWICK, Judge.
William A. Pullum brought suit against appellees charging that Edwin Mac Johnson defamed him in a radio broadcast when Johnson called him a "drug pusher." The trial court granted final summary judgment concluding that Johnson's speech was protected by the First Amendment of the United States Constitution and Pullum appealed. We affirm.

I.
Pullum, a prominent citizen in Santa Rosa County, has been the head of the County *255 Tourism Development Council and been active in the local Chamber of Commerce. He owns a real estate company, a local newspaper, and two restaurants, one in Santa Rosa County and another in Okaloosa County. Edwin Mac Johnson is the pastor of Faith Baptist Church in Santa Rosa County and president of Faith Bible College, described by Johnson as a ministry of Faith Baptist Church. The college is incorporated and owns and operates a radio station doing business as Faith Communication. Johnson broadcasts a daily program on the station.
In October 1992, voters in Santa Rosa County were being asked to consider changes in local ordinances, which, if made, would have allowed the sale of liquor in Santa Rosa County. Pullum was a visible and vocal proponent of these amendments.[1] Johnson opposes the use of liquor.
In a radio broadcast on October 9, 1992,[2] Johnson read a biblical passage mentioning "strong drink," and then referred to "the drug alcohol." Johnson made statements alluding to an unnamed person, which description left no doubt (and appellees do not dispute) that Johnson was referring to Pullum, finding it ironic that one of Pullum's businesses sponsored the distribution of T-shirts stating "Just Say No To Drugs" when "he [Pullum] is pushing drugs. I mean he is a drug pusher you know, trying to push drugs, trying to get liquor you know get people to drink liquor, and sell liquor and all." After Johnson failed to respond to a letter from Pullum demanding a retraction, Pullum filed suit charging that the comments in the broadcast to the effect that he was a "drug pusher" were libelous.

II.
This case involves a verbal collision at the intersection between the common law's pro *256 tection of an individual's reputation by the law of the defamation and the First Amendment's protection of open public discourse. In Florida, as elsewhere, under the common law defamation was a tort which protected "the right of every individual to personal security [which] was deemed to embrace the right to be free from malicious publications, designed to give publicity to an imputation injuring one's good reputation." Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 238 (1933). As such, the tort of defamation reflects the biblical guides that "[t]hou shall not bear false witness against thy neighbor"[3] and that "[a] good name is rather to be chosen than great riches."[4] In addition, it protects the individual dignity of members of a society by enforcing certain rules of civil conduct.[5] As Justice Potter Stewart stated in his concurrence in Rosenblatt v. Baer, 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966):
The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being  a concept at the root of any decent system of ordered liberty.
In 1964, the United States Supreme Court for the first time subjected the law of defamation to the regulation of the First Amendment in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The rationale of New York Times and its progeny is founded on the protection of open public discourse, which the Court recognized would limit the application of the civility rules enforced by the common law tort of defamation. As the Court stated in another First Amendment case, Cohen v. California, 403 U.S. 15, 24-25, 91 S.Ct. 1780, 1787-88, 29 L.Ed.2d 284 (1971):
The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that the use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests... .
To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.
In Milkovich v. Lorain Journal Co., 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), a defamation action by a high school wrestling coach against a newspaper and reporter arising out of a column which stated that the coach committed perjury in testimony before a high school athletic association, the Court explicitly sought to establish guidelines for "establishing First Amendment protection for defendants in defamation actions," id., at 22, 110 S.Ct. at 2707, that would balance "the Amendment's vital guarantee of full and uninhibited discussion of public issues," id., against "the `important social values which underlie the law of defamation' ... and recognize that `[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation.'" Id. (quoting from Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966)). In reaching this balance, the Court in Milkovich found constitutional protection "for statements that cannot reasonably be interpreted as stating actual facts about an individual [to *257 assure] that public debate will not suffer for lack of `imaginative expression' or the `rhetorical hyperbole' which has traditionally added much to the discourse of our Nation." Id., 497 U.S. at 20, 110 S.Ct. at 2706. On the other hand, the Court determined that:
Where a statement of "opinion" on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth. Similarly, where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault as required by Gertz [v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)].
Id., 497 U.S. at 20-21, 110 S.Ct. at 2707. In finding that a defamation claim could be stated by Coach Milkovich, the Court concluded:
The dispositive question in the present case then becomes whether or not a reasonable factfinder could conclude that the statements in the ... column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding. We think this question must be answered in the affirmative.
Id., at 21, 110 S.Ct. at 2707.

III.
The trial court below found that the term "drug pusher" used by Johnson clearly denotes, in everyday meaning, a person who sells or distributes drugs illegally. A radio broadcast that falsely charges a person with the criminal status of a "drug pusher" may be defamatory and actionable, if within constitutional limitations. Lewis v. Evans, 406 So.2d 489, 494 (Fla. 2d DCA 1981). In a well-reasoned order, however, relying principally upon Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970),[6] and Old Dominion Branch No. 496 National Association of Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974),[7] the trial court below applied the analysis developed in Milkovich and concluded "in the context of a hotly contested political debate, and considering the complete statement in Mr. Johnson's broadcast ..., it is not possible for a reasonable person to understand his use of the term `drug pusher' as charging the plaintiff with the commission of a crime." We agree.
Although made in the context of a purported religious program, it is clear that here Johnson's broadcast was directed at the public political debate surrounding the upcoming vote on the proposed ordinance amendments. In reviewing such political statements, we must read the entire broadcast in context, not simply the offending words. As the Supreme Court early announced in Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987 (1819), "a publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it. So the whole item ... should be read and construed together, and its meaning and significance thus determined." A California appellate court elaborated on this principle in Desert Sun Publishing Co. v. Superior Court for Riverside *258 County, 158 Cal. Rptr. 519, 521, 97 Cal. App.3d 49, 52 (1979): "A political publication may not be dissected and judged word for word or phrase by phrase. The entire publication must be examined."
Examining Reverend Johnson's broadcast in its entirety, we conclude that the challenged "drug pusher" statement cannot reasonably be interpreted as stating "actual facts" about Pullum's illegal association with drugs. Johnson's broadcast addressed a matter of obvious public concern in Santa Rosa County and invoked exaggerated hyperbolic language to emphasize his objection to the proposed ordinance amendments that would make Santa Rosa a "wet" county. His use of this "rhetorical hyperbole" negates the impression Johnson was making a factual statement that Pullum was pushing illegal drugs.[8] It is obvious from both the context of his statement and the language used that Reverend Johnson was not stating facts about William Pullum, but was expressing a point of view using imaginative and inflammatory expression.
Consistent with the Supreme Court's opinions in Milkovich, Greenbelt and Old Dominion, our opinion in this case protects the tradition of American political debate with its imaginative, uninhibited, robust and wide-open expression. Nevertheless, we recognize that, in cases such as this, the balance between the First Amendment and law of defamation sought by Milkovich protects speech that may injure the reputation of a person, such as William Pullum, who voluntarily enters the public political arena. In fact, because of the frequent use of ill-considered, name-calling attacks in American political debate, "[w]e expect people who engage in controversy to accept that kind of statement as their lot. We think the first amendment demands a hide that tough." Ollman v. Evans, 750 F.2d 970, 1005 (D.C. Cir.1984) (Bork, J., concurring), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). We do agree, however, with the following observation contained in the concluding paragraph of the trial court's order:
Though affording protection to Defendant Johnson's speech in the instant case, the Court reminds Defendant Johnson of the razor's edge upon which he walks:
"... While the protections of the First Amendment are available to the publisher whether he writes in terms of fact or opinion, the immunity cannot be extended to allow unlimited substitution of views or conclusions, whether grounded in honesty and good faith or otherwise, in the place of known facts where the publication does not indicate to the reader that such a substitution has been made.
Free, open and robust discussion is indeed essential and encouraged for the maintenance of our democracy, however, constitutional guarantees are never regarded as absolutes. Discussion and debate can hardly be healthy where the public is not afforded the opportunity to weigh all the facts in arriving at its conclusion. In matters where the character and reputation of an individual is at stake, the grievousness of the situation is compounded. In such a case, both the public and the individual come out losers."

Ragano v. Time, Inc., 302 F. Supp. 1005, at 1009 (M.D.Fla. 1969). Mr. Johnson's statements which are at issue in this case were neither polite nor fair to Mr. Pullum; an apology would certainly be in order. The First Amendment requires neither politeness or fairness.
AFFIRMED.
KAHN and MICKLE, JJ., concur.
NOTES
[1] In its order granting summary judgment, the trial court found that "[f]or purposes of the political campaign and this action, plaintiff [Pullum] concedes he is a `public figure.'"
[2] The relevant parts of Johnson's radio broadcast are as follows:

Announcer: ... proclaiming Biblical truths to the businesses and families of Santa Rosa County. The vices of alcohol both legalized and otherwise are proclaimed according to the word of God which is contrary to modern ethics. The Biblical old fashioned ideas of close family structure is promoted and encouraged. The program is brought to you seven days a week from the auditorium of the Faith Baptist Church. Listen now as Dr. Johnson opens the word of God and shares with you the truth.
Dr. Johnson: For I am not ashamed of the gospel of Christ for it is the power of God unto salvation to everyone that believeth, unto the Jew first and also to the Greek.
* * * * * *
Open to Isaiah chapter five, a passage of scripture that we've looked at a number of times and I want to look at it again this morning, says woe unto them that rise up early in the morning that they may follow strong drink; that continue until night until wine inflame them! And the harp and the viol, the tabret, and pipe, and wine are in their feasts: But they regard not the work of the Lord, neither consider the operation of His hands. For they regard not the work of the Lord, neither consider the operation of His hands.
Verse 20: Woe unto them that call evil good and good evil; that put darkness for light, and light for darkness; that put bitter for sweet and sweet for bitter!
Woe unto them that are wise in their own eyes, and prudent in their own sight!
Woe unto them that are mighty to drink wine, and men of strength to mingle strong drink: Which justify the wicked for reward ...
* * * * * *
Verse number 14: Therefore hell hath enlarged herself, (I am reading now from the Bible, Isaiah, chapter 5 and verse 14[)]; He's already dealt with the crowd who insists on seeking strong drink, alcoholic beverages; the drug alcohol. Somebody was telling me yesterday that they found a number of T-shirts that said just say no to drugs; Just say no to drugs. And on that it had this supposedly famous real estate company's name on it. And ah, this is ah man that's got a lot of real estate in Santa Rosa County, man that owns a restaurant, man that is chairman of the tourism committee, now he, they, understand that I haven't seen this now but there has got to be a man. Just say no to drugs and yet he is pushing drugs. I mean he is a drug pusher you know, trying to push drugs, trying to get liquor you know get people to drink liquor, and sell liquor and all. Can you imagine, I mean, do you not see what we are saying. We are saying one thing and doing another thing. We do not want our children, he does not want his children to, and he does not want my children to become dope addicts. And yet for the dollar, are you listening, for the dollar people are doing things they should not do.
* * * * * *
[3] Exodus 20:16 (King James).
[4] Proverbs 22:1 (King James).
[5] See, Robert C. Post, The Social Foundation of Defamation Law: Reputation and the Constitution, 74 Calif.L.Rev. 691 (1986).
[6] In Greenbelt, Bresler was a real estate developer seeking a zoning variance on certain of his land. The newspaper reported that some people described his negotiations with the local city council as "blackmail." He sued for libel contending that he had been charged with the commission of a crime. The Supreme Court rejected the notion that the word "blackmail" implied he had committed the actual crime of blackmail, commenting that the published reports "were accurate and full" and that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet, used by those who considered Bresler's negotiating position extremely unreasonable." 398 U.S. at 13-14, 90 S.Ct. at 1541-1542.
[7] In Old Dominion, a letter circulated by the union described certain individuals as "scabs." Accompanying the letter was a literary definition of a "scab" as meaning a "traitor." Again, the Supreme Court ruled that no reasonable reader could have understood the letter as charging the plaintiffs with committing the criminal offense of treason. The word was used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty imaginative expression of the contempt felt by union members toward those who refused to join." 418 U.S. at 284-86, 94 S.Ct. at 2781-82.
[8] By comparison, the newspaper column at issue in Milkovich lacked the loose hyperbolic language which would negate the impression that the writer was seriously maintaining Milkovich committed the crime of perjury.