# DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## FOURTH DISTRICT

**DEREK WARREN LOGUE,**
Appellant,

v.

**LAUREN FRANCES BOOK,**
Appellee.

No. 4D18-1112

[June 24, 2020]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael G. Kaplan, Judge; L.T. Case No. DVCE17-5746.

Gary S. Edinger of Benjamin, Aaronson, Edinger & Patanzo, P.A., Gainesville, and James S. Benjamin of Benjamin, Aaronson, Edinger & Patanzo, P.A., Fort Lauderdale, for appellant.

J. David Bogenschutz and Jaclyn E. Broudy of J. David Bogenschutz & Associates, P.A., Fort Lauderdale, for appellee.

### ON MOTION FOR REHEARING EN BANC

KLINGENSMITH, J.

We grant the motion for rehearing en banc, vacate our prior opinion, and substitute the following in its place.

The appellant Derek Warren Logue ("Respondent") appeals a final injunction for protection against stalking. He argues, among other things, that the trial court erred in entering the injunction because the appellee failed to prove the statutory requirements for an injunction and because the injunction is a prior restraint on his free speech. We agree on both points and reverse.

This case provides our court the opportunity to address whether First Amendment freedoms have limits when applied to 21st century communications. The appellee Lauren Frances Book ("Petitioner") is a public figure—an elected official occupying the office of Florida State Senator. In addition to her duties in public office, she also runs a non-

profit organization called "Lauren's Kids" whose purpose is a laudable one—to assist survivors of sexual abuse and to prevent its occurrence. In both roles, she has been a longtime public advocate for laws that support and maintain sex offender registries, and place residency restrictions on convicted offenders.

Respondent is also a public figure—the co-founder of what is described as the Anti-Registry Movement which opposes sex offender laws.[1] In that capacity, he travels to, organizes, and participates in various demonstrations and counter-demonstrations around the nation opposing the type of sex offender laws for which petitioner advocates. In furtherance of this role, he maintains an online presence using both Facebook and Twitter accounts, as well as internet websites. One website relevant to this case is titled, "Floridians for Freedom: Ron and Lauren Book Exposed." Ron Book is Petitioner's father.

Petitioner filed for an injunction alleging that Respondent was harassing and cyberstalking her. The trial court held a hearing and took testimony from the parties and witnesses, after which the court entered the injunction against Respondent. That injunction is the basis for this appeal.

"A trial court has broad discretion to grant an injunction, and we review an order imposing a permanent injunction for a clear abuse of that discretion." *Pickett v. Copeland*, 236 So. 3d 1142, 1143-44 (Fla. 1st DCA 2018).

In support of her injunction request, Petitioner cited three primary instances of offending conduct as "threatening" to her: (1) the Respondent's protest at the end of a march in Tallahassee; (2) his appearance and conduct at a New York film festival; and (3) his social media postings on his website, blog, and other social media platforms.

At the injunction hearing, Petitioner testified about these three instances. She expressed her fear of Respondent and testified about contacting law enforcement to ensure her safety and that of her young children.

*The First Instance–The Tallahassee Protest*

---

[1] In 2001, an Alabama court convicted Respondent of improper relations with a minor.

2

Petitioner cited to Respondent's presence at what was, by all accounts, a peaceful demonstration in Tallahassee during a 2015 event called the "Walk in My Shoes." This event predated Petitioner's election to public office. The undisputed evidence presented at the injunction hearing showed that Respondent attended and had also encouraged others to join in his protest against the march. During the event, Respondent stood at the side of the road across the street from the State Capitol holding a three-by-three-foot handwritten sign protesting Petitioner's advocacy of sex offender registration laws. Respondent's protest also included a diorama of a homeless camp and a commode chair bearing the title, "King Ron's Throne," a reference to Petitioner's father. By all accounts, the protest included no threats or threatening activity whatsoever. Law enforcement had been notified of the protest in advance, and there were no untoward incidents reported regarding the Respondent's conduct. While this event may have been displeasing or even embarrassing to Petitioner, there is nothing from the testimony presented to the court about Respondent's activities at this protest that would in any way support the issuance of an injunction.

*The Second Instance–The Film Festival*

Petitioner also recounted an incident that occurred at the Tribeca Film Festival in 2016 during a screening of the film, "The Untouchables"—a documentary film about sex offenders and the use of registries. The film includes interviews and footage of Petitioner, Petitioner's father, and Respondent. The evidence at the hearing showed that Petitioner knew in advance from a variety of sources that Respondent would be there and chose to attend anyway, albeit, with security in place. The undisputed testimony revealed that Respondent sat several rows behind Petitioner during the movie. No interaction occurred between them whatsoever either before or during the film. At the end of the movie, Petitioner walked to the front of the theater to take questions. After several audience members were given the opportunity to ask questions, the microphone was given to Respondent who asked Petitioner a question along the lines of "how can you sit there and talk about how people on the registry don't deserve a second chance when your father . . . is a convicted criminal and he got [a] second chance?" Taking the encounter in the light most favorable to Petitioner, Respondent was "aggressive and shouting" and pointed his finger as he asked the question. Petitioner answered the question and, following the interaction, exited the theater. At no time did Respondent attempt to approach Petitioner or initiate any other contact with her. Witnesses confirmed that Respondent never left his seat in the auditorium before he was handed the microphone to ask his question, nor did he ever approach Petitioner in any way. Respondent was not ejected

3

from the theater and did not follow Petitioner outside. As with the first incident, there is nothing about this interaction that would support the issuance of an injunction.

*The Third Instance–Respondent's Website and Social Media*

Lastly, Petitioner highlighted certain content found on Respondent's "Ron and Lauren Book Exposed" website as well as other social media platforms as cause for concern. One is a picture of Petitioner's home along with her address posted on Respondent's website. The second is a video for a song containing an obscene title, with lyrics that are "Not Safe For Work" posted on his Twitter page. The third is a cartoon depicting a headstone with a vulgar insult (undoubtedly referring to Petitioner) and the phrase, "Died of Natural Causes."

Respondent's website is essentially a blog that primarily republishes news articles about Petitioner and her father, detailing what Respondent describes as "their questionable activity." As a result, most of the website's content is culled from various third-party sources and contains information published in other media. It is undisputed that Respondent never directly communicated with Petitioner about any of the posts, nor did he ever send them to her or any of her associates. According to one witness who testified at the injunction hearing, Petitioner and her group only learned of the posts from third-parties, and became concerned because "it seemed to be the language was maybe more inflammatory and very opinion based, using language that was . . . kind of angry or derogative, insulting, personally insulting in addition to being just kind of a disagreement of opinions and ideas." Even in the light most favorable to Petitioner's view of the content and assuming that description to be accurate, none of the posts are sufficient to support an injunction, because none of them constitute either a threat or harassment under the cyberstalking statute.

The picture of Petitioner's home placed on Respondent's website was a Google snapshot of the structure found at the address listed in the public records as belonging to "Lauren's Kids," the advocacy group and political action committee (PAC) founded and operated by Petitioner. This fact was revealed to the court at the injunction hearing. It was also undisputed that all the information posted about the house, including its address, purchase price, and photo, was obtained entirely from publicly accessible records. Respondent violated no privacy laws or other confidentiality restrictions by republishing that information.

*Other Testimony at the Hearing & Grant of the Injunction*

4

Law enforcement witnesses testified that they viewed Respondent as a credible threat to Petitioner and described steps undertaken to ensure her safety. The FBI investigated Respondent while local and state law enforcement provided Petitioner with protection. Respondent's criminal history was learned during the investigation as was the existence of a domestic violence injunction entered against him.

The trial court considered each of these instances and granted the injunction against Respondent without identifying which of the various occurrences supported it. The court ordered Respondent to have no contact with Petitioner either directly or through a third party, or with "anyone connected with Petitioner's employment or school to inquire about Petitioner or to send any messages to Petitioner" and to refrain from "publish[ing] any statement threatening the Petitioner." The trial court also ordered Respondent "not go to, in, or within 500 feet of the Petitioner's residence or place of employment," "100 feet of the Petitioner's vehicle," or "1,000 feet of the Petitioner."

On appeal, Respondent argues the trial court erred in issuing the injunction for three statutorily required reasons. First, he argues his actions served a legitimate purpose in advocating against restrictive legislation adversely affecting sex offenders. Second, he claims that his social media activities do not constitute "a course of conduct directed at a specific person" as required by section 784.0485, Florida Statutes (2016). And third, Respondent asserts that Petitioner's subjective fear does not satisfy the objective "reasonable person" standard required by the statute.

Petitioner claims that: Respondent's actions are threats that served no legitimate purpose; Respondent's actions were clearly "directed" at her; his postings threatened her safety; and her fear is reasonable because Respondent is a convicted child molester with a domestic violence injunction previously issued against him. She also asserts that Respondent's post containing pictures of her home and its address have placed her and her children in fear for their safety.

"Section 784.0485 . . . allows an injunction against stalking, including cyberstalking." *David v. Textor*, 189 So. 3d 871, 874 (Fla. 4th DCA 2016). Section 784.048, Florida Statutes (2016), defines stalking, which by its express language includes both harassment and cyberstalking: "[a] person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking." § 784.048(2), Fla. Stat. (2016). "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person *and* makes a credible threat to

5

that person commits the offense of aggravated stalking." § 784.048(3), Fla. Stat. (2016) (emphasis added).

Section 784.048(1) provides definitions for the terms utilized within that section:

> (a) "Harass" means to engage in a *course of conduct directed at a specific person* which *causes substantial emotional distress* to that person and *serves no legitimate purpose.*
> (b) "Course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose. The term does not include constitutionally protected activity such as picketing or other organized protests.
> (c) "Credible threat" means a verbal or nonverbal threat, or a combination of the two, including threats delivered by electronic communication or implied by a pattern of conduct, which places the person who is the target of the threat in reasonable fear for his or her safety or the safety of his or her family members or individuals closely associated with the person, and which is made with the apparent ability to carry out the threat to cause such harm. It is not necessary to prove that the person making the threat had the intent to actually carry out the threat. The present incarceration of the person making the threat is not a bar to prosecution under this section.
> (d) "Cyberstalk" means:
> 1. To engage in a *course of conduct to communicate*, or to cause to be communicated, words, images, or language by or through the use of electronic mail or electronic communication, *directed at a specific person*; or
> 2. To access, or attempt to access, the online accounts or Internet-connected home electronic systems of another person without that person's permission, causing substantial emotional distress to that person and serving no legitimate purpose.

§ 784.048(1), Fla. Stat. (2016) (emphases added).

This court previously articulated the requirements to obtain an injunction to protect against stalking:

> In order to be entitled to an injunction for stalking, the petitioner must allege and prove two separate instances of

6

stalking. "Each incident of stalking must be proven by competent, substantial evidence to support an injunction against stalking." When considering the sufficiency of the evidence, "[c]ourts apply a *reasonable person standard*, not a subjective standard, *to determine whether an incident causes substantial emotional distress*."

*David v. Schack*, 192 So. 3d 625, 627-28 (Fla. 4th DCA 2016) (citations omitted) (emphases added).

A. *"A Course of Conduct Directed at a Specific Person"*

None of Respondent's posts were sent directly to Petitioner. The question that remains, however, is whether those posts were directed at her. Decisions by our sister courts in the Second and Third Districts on whether "a course of conduct [is] directed at a specific person" have been interpreted to exempt social media messages from qualifying as the type of conduct covered by section 784.048, Florida Statutes. *See Horowitz v. Horowitz*, 160 So. 3d 530, 531 (Fla. 2d DCA 2015) (reversing injunction because posts were not directed at a specific person); *Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d 1086, 1092 (Fla. 3d DCA 2014) (reversing injunction against cyberstalking for internet posts). This court has also previously expressed general agreement with that view. *See Textor*, 189 So. 3d at 875.

As with any case of statutory construction, we begin with the "actual language used in the statute." *Borden v. East-European Ins. Co.*, 921 So. 2d 587, 595 (Fla. 2006). Where such statutory language is "clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984) (quoting *A.R. Douglass, Inc. v. McRainey*, 137 So. 157, 159 (1931)).

We believe such a narrow interpretation, which exempts social media messages from coverage under section 784.048, does not align with the plain language of that statute. The plain words of the statute do not require that the communications be intended for transmission to the victim. Section 784.048 only requires that the course of conduct be *directed at* a specific person, not necessarily *directed to* a specific person. While the statute defines "course of conduct," it does not define the term "directed at."

In construing statutory terms, Florida courts commonly adopt the plain meaning of words as contained in dictionaries. *See Puy v. State*, 2020 WL 1873236 (Fla. 4th DCA April 15, 2020) (using Merriam-Webster online dictionary to define the word "threat" for its "plain meaning which would be measured by common understanding and practice."). One such dictionary, Webster's Third New International Dictionary,[2] gives a definition of "direct" that includes "to engage in or launch hostilely" and to "focus"; "these definitions apply when the word 'direct' is "used with 'against' or 'at.'" *See State v. Ardell*, No. 2017AP381-CR, 2018 WL 1176889 at *6 (Wis. Ct. App. 2018). Therefore, a course of conduct "directed at" a victim can include communications with third parties.

For example, social media postings that are not sent directly to an individual may nonetheless be directed at an individual in a number of ways, including by "tagging" that person in a post, or by sufficiently describing the person in such a way as to make their specific identification possible. Such posts may also be designed so as to be reasonably likely to come to the attention of the targeted person, even if indirectly. Accordingly, a credible threat made on social media can be actionable under the statute even if that post was not sent directly to the person targeted. Because the wording of the statute expressly encompasses communications to third parties, we decline to interpret the statute so strictly as to defeat its purpose.

A closer look at *Horowitz* and *Chevaldina* also do not support excluding social media posts from the statute's reach. In *Horowitz,* the Second District reviewed a trial court's injunction for protection against domestic violence to protect an estranged wife from her husband who claimed she was a victim of cyberstalking based on two posts placed on the husband's Facebook page. 160 So. 3d at 530-31. The first post featured the lyrics to a song that the wife had recently listened to in the privacy of her home. *Id.* at 531. The second post contained private messages between the wife and a third party via her personal Facebook account. *Id.* It was alleged that these posts made the wife fear that the husband "either 'hacked' her computer or was somehow spying on her." *Id.*

The court in *Horowitz* determined that the Facebook posts in that case did not meet the statutory definition of cyberstalking for two reasons. *Id.* First, it reasoned, these posts were not directed at a specific person; instead, they included information posted to the husband's own page, the wife was not tagged or mentioned, and the posts were not otherwise

---

[2] WEBSTER'S THIRD NEW INT'L DICTIONARY, UNABRIDGED 640 (Philip Babcock, et al. eds., 1966).

8

directed toward her in any obvious way. The court observed, "[u]nlike email communication, . . . posts to one's own Facebook page are not directed at a specific person but are instead posted for all of the user's Facebook 'friends' to see, depending on the user's privacy settings." *Id.* Thus, the court acknowledged that, while the facts were disconcerting, the incidents did not rise to the level of cyberstalking. *Id.* at 532.

Although this language could be read as a blanket exclusion for social media posts, the fact that the court indicated that the wife was not tagged or mentioned, and that the posts were not obviously aimed towards her, indicates that the Second District intended to leave the door open to applying the stalking statute in those types of cases. In fact, in a subsequent case, *Scott v. Blum*, 191 So. 3d 502, 503 (Fla. 2d DCA 2016), the Second District found that emails sent to 2,200 members of an organization did not constitute words "directed at a specific person" for purposes of the cyberstalking statute simply because the emails were about the petitioner. These emails were not "addressed" to petitioner, and nothing indicated that he was an intended recipient. *Id.* at 504-05; *cf. Branson v. Rodriguez–Linares*, 143 So. 3d 1070, 1071 (Fla. 2d DCA 2014) (concluding that sending more than 300 emails to the petitioner constituted evidence of stalking). Cases involving the harassment of purported victims via third parties as grounds for an injunction under Chapter 741 indicate that such conduct would not support a finding of objectively reasonable fear of imminent danger from domestic violence. *See* § 741.30(6)(b), Fla. Stat. (2016); *Bacchus v. Bacchus*, 108 So. 3d 712, 715 (Fla. 5th DCA 2013) ("Even harassment of the wife through third parties would be insufficient to warrant the imposition or extension of an injunction."); *accord Giallanza v. Giallanza*, 787 So. 2d 162, 164 (Fla. 2d DCA 2001). However, injunctions under Chapter 748 based on allegations of stalking have different requirements than those sought under Chapter 741 for domestic violence.

The Third District in *Chevaldina* considered whether certain internet blog postings constituted "cyberstalking" and were "incidents of violence," i.e., stalking, as to justify an injunction pursuant to section 784.046. *See* 133 So. 3d at 1091. There, the trial court determined that "the Defendants have blogged extensively about the Plaintiff and many of these blogs are arguably defamatory," and subsequently entered a temporary injunction against the respondent making more defamatory blog posts in the future. *Id.* at 1089. In reversing the lower court's order, the Third District did not hold that social media posts were exempt from being the basis for an injunction, it only held that the appellees failed to introduce evidence that those specific blog posts were being used "to communicate, or to cause to be communicated, words, images, or language . . . directed at a specific

person, causing substantial emotional distress to that person and serving no legitimate purpose." *Id.* at 1091-92 (quoting § 784.048(1)(d), Fla. Stat.).

The Third District also aptly recognized that an injunction should "never be broader than is necessary to secure to the injured party relief warranted by the circumstances involved in the particular case." *Id.* at 1091 (citing *DeRitis v. AHZ Corp.*, 444 So. 2d 93, 94 (Fla. 4th DCA 1984)). "Entry of an overly broad injunction can constitute a violation of the First Amendment." *Id.* (citing *Adoption Hot Line, Inc. v. State*, 402 So. 2d 1307, 1308–09 (Fla. 3d DCA 1981)).

Finally, the Third District emphasized that, regardless of the forum, actions designed to harangue or threaten violence are not protected:

> Angry social media postings are now common. Jilted lovers, jilted tenants, and attention-seeking bloggers spew their anger into fiber-optic cables and cyberspace. But analytically, and legally, these rants are essentially the electronic successors of the pre-blog, solo complainant holding a poster on a public sidewalk in front of an auto dealer that proclaimed, "DON'T BUY HERE! ONLY LEMONS FROM THESE CROOKS!" Existing and prospective customers of the auto dealership considering such a poster made up their minds based on their own experience and research. If and when a hypothetical complainant with the poster walked into the showroom and harangued individual customers, or threatened violence, however, the previously-protected opinion crossed the border into the land of trespass, business interference, and amenability to tailored injunctive relief. The same well-developed body of law allows the complaining blogger to complain, with liability for money damages for defamation if the complaints are untruthful and satisfy the elements of that cause of action. Injunctive relief to prohibit such complaints is another matter altogether.

*Id.* at 1092.

Here, although the posting of the vulgar song may have been directed at Petitioner and was certainly intended to be insulting, it was not credibly or objectively threatening. *See Scott*, 191 So. 3d at 504; *see also Textor*, 189 So. 3d at 875 (stating that a murder-related comment "hardly amount[ed] to an actual and credible threat of violence"); *Chevaldina*, 133 So. 3d at 1091–92 ("the appellees failed to introduce evidence that specific blog posts were being used" in violation of Florida's cyberstalking law,

section 784.048(1)(d), Florida Statutes (2012)).  Regardless, injunctions are not available to stop someone from uttering insults or falsehoods.  *See, e.g., Concerned Citizens for Judicial Fairness, Inc. v. Yacucci*, 162 So. 3d 68, 72 (Fla. 4th DCA 2014); *Vrasic v. Leibel*, 106 So. 3d 485, 486 (Fla. 4th DCA 2013) (holding that an injunction remedy is not available to prohibit defamatory or libelous statements).  One reason for this is that there is an adequate remedy at law: an action for damages.  *See Yacucci*, 162 So. 3d at 72; *Vrasic*, 106 So. 3d at 486.  Political figures can pursue defamation actions, provided that they are able to prove actual malice on the part of the defamer.  *See Barnes v. Horan*, 841 So. 2d 472, 479-80 (Fla. 3d DCA 2002) (involving a defamation action by losing candidate for State Attorney); *Dockery v. Fla. Democratic Party*, 799 So. 2d 291, 293–94 (Fla. 2d DCA 2001); *Pullum v. Johnson*, 647 So. 2d 254, 257 (Fla. 1st DCA 1994).  But merely tossing insults, as Respondent did in this case, is not defamation.  *See Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52 (Fla. 4th DCA 1976) (overturning plaintiff's libel action where "defendants characterized [the plaintiff's] tenure in office as [u]nsuccessful, and stated that he was unfit to hold the office of Superintendent of Public Instruction because of his [i]neptness, incompetence and [i]ndecisiveness.").  Even if it were, an injunction is not the appropriate remedy.

The third instance cited by Petitioner as support for the injunction, the vulgar cartoon, is similarly insulting to Petitioner as is the song.  However, it is also not credibly or objectively threatening.  In fact, when viewed in context and in consideration of what the tombstone in the cartoon actually says ("Died of Natural Causes"), the post negates any implication of violence and appears to be nothing more than an intense expression of antipathy toward Petitioner.  The wording is no more a threat against her than if it said, "Died by Falling Meteor."  Merely wishing someone ill health in a public forum, without more, cannot serve as the legal basis for an injunction.

B.  *"Conduct That Serves No Legitimate Purpose"*

A finding of "no legitimate purpose" to a given action must not only comport with common sense, it must also be evidenced by a complete lack of usefulness or utility.  *See Textor*, 189 So. 3d at 875 ("[W]hether a communication serves a legitimate purpose is broadly construed and will cover a wide variety of conduct.").

Considering the various events alleged, we cannot say they were so devoid of a legitimate purpose as to make them actionable under the statute.  Each party in this case is a vocal advocate for opposite positions on sex offender laws.  Despite Petitioner's complaints, Respondent's

11

Tallahassee protest was by all accounts peaceful—even if unpleasant to Petitioner in its scope and message—and non-violent. *See* § 784.048(1)(b), Fla. Stat. (2016) (stating that "constitutionally protected activity such as picketing or other organized protests" are specifically exempted from being included in the definition of "course of conduct."). The parties' opposing viewpoints on such laws are widely debated within what Justice Oliver Wendell Holmes once described as the "free trade in ideas." *Abrams v. U.S.*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). True, one side of this debate has far greater public support than the other, but that does not make the Respondent's advocacy illegitimate.

As John Stuart Mill wrote, "even if the world is in the right, it is always probable that dissentients have something worth hearing to say for themselves, and that truth would lose something by their silence." JOHN STUART MILL, ON LIBERTY (1859), *reprinted in* ON LIBERTY AND OTHER ESSAYS 54 (John Gray ed., 1998). In short, Respondent's protest served a legitimate purpose even though Petitioner found it objectionable.

Like the Tallahassee protest, Respondent's appearance at the film festival also had a legitimate purpose. While Respondent's presence may have made Petitioner uncomfortable, he was well within his rights to attend and to express his opinion on the film's subject matter—even if it was done by posing a snide and uncomfortably worded question to Petitioner. Respondent made no threats nor any threatening gestures toward her. As a result, Respondent had the same right to express his views in this public forum as if he had held up a poster complaining about a business on a public sidewalk outside of that establishment. *See Chevaldina*, 133 So. 3d at 1092.

As for Respondent putting information about Petitioner's home on his website, in light of the political activities being conducted at this location, his posting of this public information also had a legitimate purpose which was entirely within the bounds of lawful public debate. The fact that the address of Petitioner's PAC also doubles as her home address is irrelevant. Unlike a private citizen who might ordinarily take steps to maintain their privacy, Petitioner voluntarily placed the location of her home into the ambit of public discourse by operating her PAC from it—one that Respondent avers (whether accurately or not) earns more than $1 million a year from contributors that include private prison companies, tobacco companies, and beer lobbyists. Respondent's post also included information supporting his allegation that Petitioner draws a substantial salary from the PAC. Therefore, reporting and publicizing where Petitioner's PAC is headquartered, and information about how it operates, serves a valid public interest.

Respondent did not drive by Petitioner's home, take a picture of her private residence, and then disseminate that information. Petitioner's home address as an elected official is a matter of public record for the purposes of validating her residency. Additionally, Petitioner chose to use her home for business and politics. While she is certainly free to do so, she cannot then obtain an injunction against someone who elects to further publicize that widely available information. Respondent did not unjustifiably expose her private residence address to the public as Petitioner contends; he merely republished the corporate address of Petitioner's PAC along with other information about it culled from public disclosures. *See Palm Beach Newspapers, LLC*, 183 So. 3d at 483 ("Where matters of public concern are involved, privacy interests give way to the First Amendment right to publish lawfully obtained, truthful information about such matters."). Unless Petitioner's home address was otherwise private or confidential, and it was not, her actions conducting her public advocacy from the residence placed it well into the public domain. When Petitioner chose to have her non-confidential home address double as her business address, thereby voluntarily combining certain aspects of her private life with her public one, she lost the ability to claim a concurrent privacy interest in the areas that overlapped. Therefore, Respondent had the constitutional right to republish that unprotected information.

C. *The Objective Reasonable Person Standard*

Petitioner alleged that she was in fear of Respondent due to his actions, but her subjective fear cannot be the basis for the injunction's issue. "[C]ourts apply a reasonable person standard, not a subjective standard, to determine whether an incident causes substantial emotional distress." *Schack*, 192 So. 3d at 628 (quoting *Touhey v. Seda*, 133 So. 3d 1203, 1204 (Fla. 2d DCA 2014)). However, we need not make any determination about whether Petitioner's fear was objectively reasonable because the Tallahassee protest, Respondent's attendance at the film festival, and the social media posts did not satisfy the statute's requirements to support the injunction.

D. *The First Amendment*

This case presents an issue that goes to the foundation of our country—freedom of expression under the First Amendment of the U.S. Constitution. The First Amendment guarantees "the freedom of speech . . . [and] the right of the people . . . to petition the Government for a redress of grievances." Amend. I, U.S. Const. These rights are "implicit in '[t]he very idea of government, republican in form.'" *McDonald v. Smith*, 472 U.S.

13

479, 482 (1985) (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1876)). While courts must be vigilant in reviewing petitions such as the one filed in this case, they must also adhere to the Constitution and the laws enacted by our legislature.

While the record indicates that Petitioner was irritated by Respondent's actions, the Constitution protects the right of the political irritant to voice his opinions as much as it protects any citizen's right to do so. *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961) ("In a representative democracy . . . the[] branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives."). Though her frustration is understandable, expressions of opposing views, even as insults, are not the same as harassment or threats.

This exchange from the injunction hearing, a colloquy between counsel for Respondent and a law enforcement officer witness, sums up the case well:

> [Respondent's counsel]: What intentions and threats can you articulate that were made by Derek Logue against Lauren Book?
>
> [Officer]: Not one specific, sir.
>
> [Respondent's counsel]: Okay. How about any?
>
> [Officer]: The use of the song to communicate his feelings and thoughts.
>
> [Respondent's counsel]. Other than the song.
>
> [Officer]: His anger that he has expressed, which I understand is okay to do.

Simply put, the officer was correct. Publicly expressing anger toward an elected official is not a basis for entry of an injunction. In public debate, elected officials must tolerate insulting remarks—even angry, outrageous speech—to provide breathing room for the First Amendment. *See Fox v. Hamptons at Metrowest Condo. Ass'n*, 223 So. 3d 453, 456 (Fla. 5th DCA 2017). Respondent's methods and posts, as boorish, crude, and crass as they may be, must also be considered "against the background of a profound national commitment to the principle that debate on public

14

issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *see also R.A.V. v. St. Paul*, 505 U.S. 377, 414 (1992) (White, J., concurring in the judgment) ("The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected."). Respondent's actions and comments, while distasteful, are precisely the kind of "vehement, caustic, and . . . unpleasantly sharp" political speech which has historically been protected by the First Amendment and which fall outside the Florida harassment statutes. *See Sullivan*, 376 U.S. at 270.

Courts have acknowledged that what may be actionable in the context of interactions between private individuals are viewed differently in the context of political debate by public actors. *See Watts v. U.S.*, 394 U.S. 705, 708 (1969). For example, the defendant in *Watts* was convicted of violating a federal statute making it illegal to threaten the life of the President of the United States for telling a small group at a political rally "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. In finding no "threat" occurred, the Supreme Court stated in part:

> We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' The language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President.' Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.

*Id.* at 708 (internal citations omitted).

Additionally, Petitioner's subjective response to Respondent's speech does not change the fact that, even though both she and law enforcement considered him "threatening," he neither made a credible threat against her nor did his actions constitute harassment. Viewing someone as a

"threat" does not mean the person can be subject to an injunction as if he or she actually made one. Whether Petitioner has understandable concerns is not the debate. The standard for obtaining an injunction is not lessened in cases involving delicate complainants, nor is every statement or action that causes a listener fear, discomfort, embarrassment, annoyance or offense transformed as a result into a "threat" providing the basis for an injunction. *See Horowitz*, 160 So. 3d at 533 ("[T]he allegations regarding Mr. Horowitz's 'finger-gun' gesture, his habit of 'routinely' blocking Mrs. Horowitz's path, and her statement that she was afraid he would eventually hurt her, although troubling, are too vague to provide competent, substantial evidence supporting the injunction."); *Titsch v. Buzin*, 59 So. 3d 265, 266–67 (Fla. 2d DCA 2011) (finding that defendant's alleged behavior of driving by plaintiff's home, stopping his car, exiting his vehicle, making hand gesture imitating a gun and saying "bang your [sic] dead—I'm going to Fu[--ing] kill you" fell short of the legal requirements of statute governing injunctions for protection against repeat violence; mere shouting and obscene hand gestures, without an overt act that placed plaintiff in fear, did not constitute the type of violence required for an injunction against repeat violence); *Moore v. Hall*, 786 So. 2d 1264, 1265 (Fla. 2d DCA 2001) (holding that trial court erred in finding that the verbal statement from the respondent, "I should have killed her," made to a process server provided the petitioner with an objectively reasonable fear of imminent violence); *see also Giallanza*, 787 So. 2d at 165 (stating that the general harassment of petitioner and/or her children was insufficient to constitute domestic violence). The law requires that before an injunction such as this can be granted there must be legal, articulable acts of harassment, stalking, or credible threats pursuant to section 784.048. Here, Respondent's actions do not rise to that level.

Clearly, Respondent seeks to bring about political and social policy change. It is immaterial whether he enjoys significant public support for his positions. While his methods may be bombastic and extreme—particularly his many unfortunate and insulting references to Petitioner and her father—this type of political hyperbole does not take the communication out of the protections of the First Amendment.

As the U.S. Supreme Court has stated:

> [O]ne of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace. Though few might find respondent's statements anything but contemptible, his right to make those statements is protected by the Constitution's guarantee of freedom of speech and expression.

16

*U.S. v. Alvarez*, 567 U.S. 709, 729–30 (2012). The right to petition government officials was included in the First Amendment along with the guarantee of freedom of speech and freedom of press "to ensure the growth and preservation of democratic self-governance." *McDonald*, 472 U.S. at 489 (Brennan, J., concurring). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964)). "The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Garrison*, 379 U.S. at 75 (quoting *Sullivan*, 376 U.S. at 270).

As tempting as it might be to force some civility into the matter by stanching Respondent's speech against Petitioner with a court order, to do so would ignore the protections of the First Amendment and the wording of the stalking statute. There was no evidence presented to the trial court that Respondent incited action by urging people to threaten harm to Petitioner or her family. Claims of threatening speech or harassing action are actionable if the speaker threatens, harasses or intimidates, and intended targets would reasonably perceive that intent. Merely posting public information, or potentially embarrassing and annoying content, without more, is not conduct within the stalking statute and does not entitle Petitioner to an injunction.

Rather than being harassing or threatening, Respondent's online speech was more of a rant, that is, a hyperbolic rhetorical response to the opposing views of a political actor. There is a real danger, from a First Amendment perspective, that questionable speech by speakers from sub-communities perceived as deviant could become hyper-critiqued, and over-sanctioned. But in analyzing both intent and effect, context matters.

Because Petitioner is a public figure and not a private citizen seeking quiet contentment while going about her day-to-day life, the calculus about what constitutes harassment, credible threats, or even defamation against her is different. Public officials, by the very nature of their positions, are sometimes required to endure the passions and pleas of the public as they do the people's work. On occasion, civility takes a backseat to those passions. While most advocates are respectful, others are uncivil and do little to advance their cause, often undermining their efforts with uncontrolled emotions and actions. Although regrettable, legislators and other public officials sometimes receive intemperate attacks from some of the citizens they represent when advocating for issues others may

17

strenuously oppose. *See Sullivan*, 376 U.S. at 270. Yet they are all nonetheless part of our political process. That has been the nature of elected office and a fact of political life since the founding of the Republic.

No one likes being the target of the kind of disgusting invective hurled by Respondent against Petitioner. And given Petitioner's personal history, she may indeed have a heightened sensitivity to the content of these posts. But the Constitution requires that public figures, including both elected and non-elected officials, have thicker skin in their response to insults or republication of unfavorable news articles by political gadflies when they choose—voluntarily—to enter the public arena. "The law expects a political candidate to accept republication of previous newspaper stories 'as their lot. . . . [T]he first amendment demands a hide that tough.'" *Yacucci*, 162 So. 3d at 73 (citing *Ollman v. Evans*, 750 F.2d 970, 1005 (D.C. Cir. 1984) (Bork, J., concurring) (concerning a private defamation suit against newspaper columnists for statements made during a political controversy)). Nothing in the First Amendment requires that constituents be kind, or even polite, in communications with or about their elected representatives and public officials. Its protections ensure the right of citizens in the body politic to dissent and express their opinions and desires, even in less-than-genteel ways, on matters of public interest without the threat of prosecution, an injunction, or some other legal action.

Respondent's offensive vulgar and insulting posts are part of that friction and grist of public discourse intended by our Founders when forming this nation. Petitioner may feel discomfort by Respondent's anger as expressed in his postings, but discomfort is not tantamount to being threatened or harassed. His speech advocates for citizen-led political change and seeks to influence the legislative process. Though his words may be base and insulting at times, it is also pure, political, and protected protest deserving of the broadest possible First Amendment protections.

E. *Conclusion*

The injunction process was not intended for use in punishing mere offensive incivility, or statements that in isolation may appear far more menacing than when considered in their true context. Injunctions should be reserved for cases of harassment, stalking or actual threats of imminent harm as the Legislature intended, not to silence annoying political opponents. Although we do not hold that an elected official can never be the victim of stalking, these statutes cannot be used to chill the merely bombastic and caustic communication alleged by Petitioner. The First Amendment forbids that, and such speech must be protected even when

the message—or the messenger—is unpopular or controversial. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.").

The injunction in this case prohibited Respondent from having direct or indirect contact with Petitioner "by mail, email, fax, telephone, through another person, or in any other manner, including electronic means or use of social media." An injunction directed to speech is a classic example of prior restraint on speech triggering First Amendment concerns. *See Vrasic*, 106 So. 3d at 486. Because the injunction seeks to prohibit such speech, the overbroad nature of the injunction prohibits Respondent from posting *anything* related to Petitioner, even statements that would unquestionably constitute pure political speech.[3]

In sum, not only did Respondent's actions fail to meet the requirements of stalking under Florida Statute 784.048, the trial court's injunction also improperly restrained Respondent's exercise of his constitutional rights. For these reasons, we reverse the injunction.

*Reversed.*

LEVINE, C.J., GROSS, DAMOORGIAN, GERBER, CONNER, FORST, and KUNTZ, JJ., concur.
GROSS, J., concurs specially with opinion.
GERBER, J., concurs specially with opinion, in which CONNER and FORST, JJ., concur.
MAY, J., dissents with opinion, in which WARNER and CIKLIN, JJ., concur.

GROSS, J., concurring specially.

I concur fully in the majority opinion and write separately to emphasize why I believe the case is appropriate for en banc treatment.

---

[3] As further indication that the injunction here constitutes a prior restraint on Respondent's free speech, we note the distance from which he was ordered to stay away from the Petitioner's place of employment (500 feet). Here, that employment includes Florida's Capitol Building, which effectively denied him access to a key means of political and constitutional expression—the ability to petition Florida's government officials. *See Frandsen v. Dep't of Envtl. Prot.*, 829 So. 2d 267, 269 (Fla. 1st DCA 2002).

Florida Rule of Appellate Procedure 9.331(a) declares that an appellate court may consider a case en banc if it is "necessary to maintain uniformity in the court's decisions" or if a case or issue is of "exceptional importance."

The First Amendment issue presented by this case is of exceptional importance.

Recently, cases have surfaced where politicians have attempted to use the court system to stifle political opposition. *See, e.g., WPB Residents for Integrity in Gov't, Inc. v. Materio*, 284 So. 3d 555 (Fla. 4th DCA 2019); *Concerned Citizens for Judicial Fairness v. Yacucci*, 162 So. 3d 68 (Fla. 4th DCA 2014). There have also been the similar cases involving the right to petition the government, *see, e.g., Hurchalla v. Lake Point Phase I, LLC*, 278 So. 3d 58 (Fla. 4th DCA 2019),[4] and a quasi-government seeking to discourage journalistic coverage. *See Seminole Tribe of Fla. v. Times Publ'g Co.*, 780 So. 2d 310, 316-17 (Fla. 4th DCA 2001).

Lies, misrepresentations, and misdirection have long been a staple of politics. In earlier times, lies slithered locally, without the means to attract a larger audience. Today, social media distributes lies worldwide without any vetting for veracity. It is understandable that in the heat of a campaign, a politician might seek to divert an attack before the ballot boxes are open for business.

While the drafters of the First Amendment did not conceive of the Internet, they know the paramount importance of freedom of speech. Since the dawn of the Republic, it has been the responsibility of voters to exercise political judgment, to examine political speech and to separate truth from fiction in casting a vote. If the First Amendment stands for anything, it is that courts should rarely, if ever, interfere with the political process by punishing or penalizing political speech. "[T]he First Amendment assures the broadest tolerable exercise of free speech, free press, and free assembly, not merely for religious purposes, but for political, economic, scientific, news, or informational ends as well." *Douglas v. City of Jeannette (Pennsylvania)*, 319 U.S. 157, 179 (1943) (Jackson, J., concurring in result).

As Justice Jackson wrote over 75 years ago,

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be

---

[4] In *Hurchalla*, the defendant/appellant failed to preserve a significant First Amendment issue for presentation to the jury.

20

orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.

*W. Va. Bd. of Ed. v. Barnette,* 319 U.S. 624, 642 (1943).

GERBER, J., concurring specially.

I fully concur with the majority opinion. I write separately only to emphasize a point not raised until the majority opinion's conclusion: "[W]e do not hold that an elected official can never be the victim of stalking." Maj. op. at 18.

None of the four statutes currently addressing stalking – sections 784.048, 784.0485, 784.0487, and 784.049, Florida Statutes (2019) – exclude an elected official from being the victim of stalking or from seeking an injunction for protection against stalking. Further, while section 784.048(1)(b) provides the term "course of conduct," as used in the stalking statutes, "does not include constitutionally protected activity such as picketing or other organized protests," that exclusion should not be read to suggest an elected official can never be the victim of stalking under the foregoing statutes.

As the majority opinion indicates, "[t]he law requires that before an injunction such as this can be granted there must be legal, articulable acts of harassment, stalking, or credible threats pursuant to section 784.048. Here, Respondent's actions do not rise to that level." Maj. op. at 16. I agree with that conclusion in this case, even though I also recognize the disturbing nature of certain of Respondent's postings about Petitioner.

However, one day a case may appear in which a person's verbal or nonverbal threats to an elected official places the official "in reasonable fear for his or her safety or the safety of his or her family members or individuals closely associated with the person, and which is made with the apparent ability to carry out the threat to cause such harm," thus qualifying as a "credible threat" under section 784.048. Judges must be cognizant about such a possibility existing, so that we may provide the official facing such a threat with the protections which the law permits.

CONNER and FORST, JJ., concur.

MAY, J., dissenting.

We join in the majority's decision to recognize that social media can qualify as the type of conduct covered by section 784.048, Florida Statutes. We depart from the majority when it mistakenly holds that the evidence was insufficient to support the injunction in this case.

The majority's position boils down to the following:

- The respondent's postings are vulgar "rants" insufficient to satisfy the statute's requirement of stalking.
- The respondent's vulgar "rants" serve a legitimate purpose.
- The First Amendment protects the respondent's vulgar "rants."
- Because the petitioner is a public figure, she is somehow exempt from the same protections as other citizens.
- And, she could sue for defamation damages as an adequate remedy.

We disagree with all of them.

"A trial court has broad discretion to grant an injunction, and we review an order imposing a permanent injunction for a clear abuse of that discretion." *Pickett v. Copeland*, 236 So. 3d 1142, 1143–44 (Fla. 1st DCA 2018). In our view, the majority did not give the trial court that discretion.

An injunction may issue when a person stalks another individual. *See* §748.048, Fla. Stat. "A person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking . . . ." § 784.048(2), Fla. Stat. "Harass" is defined as "engag[ing] in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." *Pickett*, 236 So. 3d at 1144.[5]

The majority agrees the social media postings were "directed" at a specific person—the petitioner. So, the issue is whether the respondent willfully, maliciously, and repeatedly harassed the petitioner through a course of conduct which caused her substantial emotional distress and served no legitimate purpose. The trial court found he did and we agree.

---

[5] The majority cites *David v. Schack*, 192 So. 3d 625, 627–28 (Fla. 4th DCA 2016) to suggest the petitioner must prove two instances of stalking. *See* Maj. op. at 6-7. However, the statute does not require two incidents of stalking. Rather it requires "willfully, maliciously, and repeatedly follow[ing], harass[ing], or cyberstalk[ing]," which constitutes stalking. § 784.048(2), Fla. Stat.

- ***Respondent's Postings Constitute Stalking***

As the majority explains, the petitioner alleged three types of offending conduct: (1) the respondent's Tallahassee protest; (2) his appearance and conduct at a New York film festival; and (3) his multiple postings on his website, blog, and other social media platforms. We agree with the majority that the first two conduct types are protected under the First Amendment and do not constitute harassment. However, unlike the majority, we view the multiple incidents of social media postings as willful, malicious, and repeated harassment sufficient to satisfy the statute.

A "'[c]ourse of conduct' means a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose." §784.048(1)(b), Fla. Stat. That is precisely what happened here.

The respondent posted the petitioner's address and a picture of her home on a website he entitled "Ron and Lauren Book Exposed." He posted a video of a song containing an obscene title, with lyrics that include: "I am going to 'f___ up your face'", and "[y]ou maniac, gonna get you back." He posted a cartoon depicting a headstone with three lines—"R.I.P.," "Annoying C___," and "Died of Natural Causes." He then tweeted about the song. This was a pattern of conduct composed of a series of acts over a period of time that evidenced a continuity of purpose—harassment of the petitioner.

The majority suggests the respondent's "rants" were simply vulgar expressions that he is entitled to make under the First Amendment.[6] We disagree. When such rants are posted on social media, they take on a more global reach. In short, the petitioner proved the respondent willfully, maliciously, and repeatedly harassed her.

- ***The Rants Served No Legitimate Purpose***

The respondent's multiple vulgar postings and tweets also served no legitimate purpose. In them, he did not advocate against tough sex offender laws. Instead he engaged in name-calling, vulgar language, and disclosure of the petitioner's home and address for those who visited his website to see. There was no legitimate purpose to them. They were meant to harass the petitioner and occurred on multiple occasions. While his

---

[6] "Rather than being harassing or threatening, Respondent's online speech was more of a rant, that is, a hyperbolic rhetorical response to the opposing views of a political actor." Maj. op. at 17.

advocacy against restrictive legislation may serve a legitimate purpose, his vulgar, demeaning postings do not. His advocacy does not give him license to harass the petitioner.

Nevertheless, the majority suggests that because the petitioner's home and address were obtained from public sources that somehow makes their posting on the respondent's website immune from consideration as a type of harassment. Of course, the majority cites no authority for that proposition. While the petitioner chose to use her home address for a PAC, she did not choose to have it posted on a website dedicated to sex offenders.

The majority then suggests there was no evidence that respondent incited action by urging people to threaten harm to the petitioner or her family. That may be true, but the statute doesn't require such evidence. Must we wait until someone commits some violent act before our system can protect its citizens? Haven't we witnessed enough tragedies to know that our failure to address precursors of violence often leads to a more egregious tragedy?

Today we live in a culture where social media postings, like those involved here, have led people to lash out and wreak havoc on our children, families, friends, and communities. Social media posts, which direct attention and can motivate others to act, are threatening and dangerous. In fact, perhaps more so as the subject of the postings has no way of knowing who reads or may act upon them.

Indeed, we have witnessed a man arrested for sending pipe bombs to several legislators allegedly as a result of social media postings that inspired him. International terrorists have been radicalized through social media. And, our elections have now fallen prey to manipulated social media.

The respondent's "rants" served no legitimate purpose.

- ***The Petitioner Had an Objective Reasonable Fear.***

The petitioner pled and proved she was in fear of the respondent due to his social media postings. Law enforcement testified the respondent was a credible threat, so much so that they provided security for her. The majority references it, but gives no weight to, this testimony. Instead, the majority relies on what is perceived as the petitioner's failure to prove "stalking" and avoids the reasonable fear issue.

24

And, the majority fails to mention the psychologist's testimony. Although he did not evaluate the respondent, he testified, over the respondent's objection, to the factors used to assess risk.

> So if you have all those factors together, someone with an agenda, somebody who affiliates with others with that same agenda, somebody who increases their approach, somebody who's angry or has angry outbursts, somebody who announces their intentions in terms of what they're going to do, all of those things together can significantly increase an individual's risk potential.

The majority glosses over the respondent's conviction as a child molester and someone who has had a domestic violence injunction issued against him for making violent threats against a woman. In short, competent substantial evidence established the respondent's posts would cause substantial emotional distress to a reasonable person—and did so in this case to the petitioner.

The petitioner's fear was real and reasonable. The respondent's actions have placed her and her children in fear for their safety. Law enforcement recognized as much. And, so did the trial court.

The majority also suggests that "[p]ublic officials, by the very nature of their positions, are sometimes required to endure the passions and pleas of the public as they do the people's work" and that civility takes a backseat to those passions. Maj. op. at 17. But the statute doesn't differentiate between ordinary citizens and public figures. Nor should we.

This is not a defamation case where the petitioner's status as a public figure changes the rules. Florida's stalking statute does not discriminate. It does not create a different heightened standard for public figures, as noted by Judge Gerber in his concurrence.

And last, the majority suggests that a defamation action is an adequate remedy for the petitioner. In doing so, the majority overlooks the reality that money does not compensate a reasonable person for having to live in fear due to harassment that serves no legitimate purpose.

### *CONCLUSION*

We live in times where violence occurs all too frequently and an ordinary day may turn into a horrific tragedy. Must we wait for a tragedy to occur before the judicial system recognizes the threat? There are

25

already too many examples in this country where failure to act has resulted in significant harm. So, it is necessary for courts to be vigilant in reviewing petitions such as the one filed in this case. Courts must also adhere to the Constitution and the laws enacted by our legislature. Given the discretion afforded the trial court, we would affirm.[7]

WARNER and CIKLIN, JJ., concur.

*     *     *

---

[7] The respondent also argues the injunction was a prior restraint on his free speech. We disagree. The injunction was aimed at keeping him a safe physical distance away from the petitioner. We do however acknowledge the unique issue raised by the distance from which the respondent was ordered to stay away from the petitioner's place of employment. Here, that employment includes Florida's Capitol Building, which effectively denied him access to a key means of political and constitutional expression—the ability to petition Florida's government officials. *See Frandsen v. Dep't of Envtl. Prot.*, 829 So. 2d 267, 269 (Fla. 1st DCA 2002). We would therefore remand the case to the trial court to modify the injunction to more narrowly provide the protection deserved.